IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

**KERRY J. NEELY**                                                              PLAINTIFF

v.                              No. 3:17-cv-282-DPM

**ARKANSAS DEPARTMENT OF
COMMUNTIY CORRECTION;
SUSAN FRANCIS, Training Academy
Supervisor, in her Official Capacity;
KEVIN MURPHY, ADCC Director, in his**\*
**Official Capacity (originally named as
Sheila Sharp); and JOHN DOES I-IV**                          DEFENDANTS

### MEMORANDUM OPINION AND ORDER

**1.** Was Kerry Neely's osteoporosis a disability for ADA purposes? Did the Arkansas Department of Community Correction consider ways she could complete the self-defense training required for grievance officers despite her osteoporosis? Could ADCC have reasonably accommodated Neely and kept her on the job?

When Neely was sixty-two years old, she sought a job handling the grievances of the non-violent felony offenders at ADCC's Northeast Arkansas Center at Osceola. ADCC hired her conditionally. During her first year, she had to complete what the department calls residential

---

\* The Court directs the Clerk to correct "her" to "his."

services basic training. She didn't. ADCC fired her. She responded with this case. The parties have filed cross motions for summary judgment on liability on her ADA and due process claims. The Court takes the record where genuinely disputed in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *Oglesby v. Lesan*, 929 F.3d 526, 531–32 (8th Cir. 2019).

ADCC is a state agency that runs adult parole and related programs throughout Arkansas. ADCC also operates community correction centers, where non-violent felony offenders can stay for up to three years of their sentences. ADCC calls them residents. Like jails, these centers are secure facilities, but the residents have much freedom and the centers offer them a range of treatment programs. ADCC distinguishes between "residential services" and "field" employees. № 38-1 at 1. Only the former work in the centers with the residents.

Administrative review officers are on the residential services side. These officers handle residents' grievances and disciplinary appeals. They also meet with and interview residents and discuss disciplinary procedures with them. As residential services employees, review officers must complete a basic training course. That training includes learning a set of defensive tactics as a precautionary measure, given the frequent interaction with residents.

Neely applied to be a review officer in late 2015 after a five-year stint as an administrative specialist with the Arkansas Department of

Correction. Her ADCC interviewers mentioned a training requirement, and her conditional offer letter said ADCC required "satisfactory completion of any required training." № 38-1 at 5. That letter also said employees must "not pose a direct threat to the health and safety of himself/herself or others," and it explained there was a one-year probationary period. *Ibid.* The record doesn't indicate that Neely knew at the time she was hired that the mandatory training involved physical activity. Instead, she figured it would consist mostly of watching videos, like her training at the Arkansas Department of Correction. She accepted the conditional offer in December 2015 and started work soon thereafter.

Neely's first opportunity to complete the basic training was in May and June of 2016. The training involved fighting activities with names like bulldog take down, front choke, and rear choke. Neely called it "kung fu stuff." № 38-2 at 42. She says she told the trainers about her osteoporosis and other conditions and she asked for "modifications," but the trainers didn't make any. № 38-2 at 45, 51. She says she was beaten, hit in the face, and kicked in the knees. She didn't complete the training because she came down with bronchitis. Training manager Susan Francis emailed Jerry Campbell, one of Neely's supervisors, and said Neely missed "the final exam and key elements of the Defensive Tactics that she would be required to demonstrate during performance testing." № 38-4 at 1. She also said

Neely did "an excellent job" and could come back to finish the training and take the test. № 38-4 at 1.

In October, after returning to work from FMLA leave, Neely filled out an "essential job functions" form. № 38-1 at 7. One function was to "[s]uccessfully complete required training." Ibid. The form asked employees if they can do each function or if they need accommodation. Neely wrote that she could perform every function without accommodation. She and her doctor signed the form.

Neely made a second attempt at basic training in November. This time, she gave at least one trainer a doctor's note on the first day of training. The note said Neely "suffers from severe Osteoporosis which lends to easy bone fractures and can not participate in physical combat." № 38-1 at 8. The phrase—"can not participate in physical combat"—will assume prominence in due course. Neely says the trainers let her make some adjustments. For instance, when class participants were supposed to fall, she didn't need to actually fall to the ground, and only two people would beat her instead of four. Otherwise, she says she performed many of the required moves.

Before she was able to take the final test in early November, Neely was fired. She says she asked the training manager, Francis, about an accommodation, but Francis declined and told Neely she was a "liability" to ADCC. № 38-2 at 89, 93, 101–3. Francis sent Neely's supervisor, Campbell, a memo saying Neely could no longer

participate in "physical combat," citing the doctor's note. № 38-5. Based on that memo and the ADCC policy requiring completion of the training, Campbell fired Neely. Neely says Campbell encouraged her to sue. He doesn't remember doing so, but he did write her a letter of recommendation a few days after she was fired.

2. Neely can prevail by showing four things: ADCC knew about her disability; she requested an accommodation; ADCC failed to engage in an informal, interactive process to identify possible accommodations; and that process could have yielded an accommodation that was reasonable. *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019).

ADCC knew about Neely's osteoporosis. It's why ADCC didn't let her complete basic training in November 2016. ADCC now argues, though, that her osteoporosis isn't a disability under the ADA. But ADCC's argument rests largely on cases decided before Congress relaxed the definition of disability in 2008. ADCC argues Neely's osteoporosis isn't a disability because it only prevents her from working a narrow range of jobs. The post-2008 ADA and its regulations, however, counsel a more straightforward analysis. 29 C.F.R. Pt. 1630 App.; *Brown v. City of Jacksonville*, 711 F.3d 883, 888–89 (8th Cir. 2013). Viewing the record most favorably to Neely, her osteoporosis prevents her from any job that might involve falling or bumping. Think security guards, physical education teachers,

firefighters, coaches, and the like. So, ADCC knew about Neely's osteoporosis, and her osteoporosis is a disability under the ADA. First showing made.

Next, did Neely request an accommodation? Yes, though the parties differ on what she asked for. ADCC says Neely asked the trainers to ignore her doctor's note and let her do the defensive tactics part of the training. Neely says she asked for modifications during both the May/June and November trainings, in the vein of no falling and less hitting. She didn't need to use the phrase reasonable accommodation or mention the ADA. *Garrison*, 939 F.3d at 941. She just needed to make ADCC aware of the need for some accommodation, and she did that.

Third, ADCC did not engage in an informal, interactive process to consider possible accommodations for Neely. She says some trainers adjusted her training by, for instance, having fewer people hit her. But higher-ups at ADCC were laser focused on Neely's doctor's note. ADCC reads the note as "prohibiting" Neely from "participating *in any type of physical combat.*" № 38 at 9 (emphasis original). ADCC was entitled to rely and act upon the doctor's note. *McNeil v. Union Pacific Railroad Company*, 936 F.3d 786, 790 (8th Cir. 2019). But the note is only one part of the whole. In light of all that had gone before, ADCC supervisors also needed to discuss possible accommodations with Neely.

Finally, could those discussions have yielded an accommodation that was reasonable? Here's where a jury must decide. Neely handled criminals' grievances, so ADCC had good reason to want folks in her position to be able to defend themselves and others when necessary. ADCC emphasizes that defensive abilities are an essential job function. And an employer's judgment about that issue is entitled to deference. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004). This issue, though, shades into whether ADCC could have accommodated Neely. ADCC was familiar with accommodating staff with various physical ailments. As one of ADCC's training instructors, Felicia Hester, explained it: "ADCC allows some accommodations for any employee who attends [the basic training] and has medical concerns which may prohibit him/her from demonstrating the Defensive Tactics [techniques]. However, the accommodations that are made cannot deteriorate the basic concepts of the techniques taught." № 38-8 at 1. As an example, Hester talked about an ADCC employee who completed the training course despite having a medical condition that required her to be cautious of head injuries. Hester didn't know specifically what accommodations were made for this employee, but said she would have allowed the employee to avoid doing "repetitions where she is repeatedly falling to the ground." № 38-8 at 3. That would be close to one of the modifications Neely says her trainers made for her. The question for the jury is whether the accommodations Neely

-7-

needed would have been reasonable, considering both her osteoporosis and the demands of her job.

3. The Court previously dismissed Neely's individual-capacity claims against Francis and Sharp, who's been replaced by Murphy. The Court now dismisses with prejudice Neely's official-capacity claims against Francis and Murphy because they're duplicative of her claims against ADCC. *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).

4. Neely testified on deposition about the possible identities of some John Does, but the Court declines to add new defendants now. The deadline for amending pleadings has long passed. Plus, Neely could only speculate about the roles of Jimmy Banks (Campbell's boss) and Ty-Junia Clark (Francis's boss).

5. Neely's due process claims are coextensive with her ADA claims. The Court therefore dismisses them without prejudice as duplicative. *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010–11 (8th Cir. 1999); *Grey v. Wilburn*, 270 F.3d 607, 610–11 (8th Cir. 2001).

\* \* \*

Cross motions, № 33 & № 36, denied. A trial is needed on one question: Given her osteoporosis and her duties as a grievance officer, could ADCC have reasonably accommodated Neely during the defensive tactics training and test?

So Ordered.

*[signed]* W.P. Marshall Jr.
D.P. Marshall Jr.
United States District Judge

8 November 2019